# **EXHIBIT 3**

# JAMS ARBITRATION
## No. 5220003126

**MOHAMMAD HONARKAR AND 4G WIRELESS, INC.,**

**Claimants,**

**MAHENDER MAKHIJANI; CONTINUUM ANALYTICS, INC.; et al.,**

**Respondents,**

**and**

**MOM AS INVESTCO, LLC; MOM BS INVESTCO, LLC; et al.,**

**Nominal Respondents.**

_____

**CONSOLIDATED WITH JAMS ARBITRATION NO. 5200001122**
_____

## RULING ON MOTION FOR ATTORNEY FEES AND COSTS

**Counsel:**

*Counsel for Honarkar and 4G (together, "Claimants")*:[1]

Aaron May, Esq., Joseph Ybarra, Esq., Abigail E. Marion, Esq., Thomas Rubinsky, Esq., and Halpern, May, Ybarra, Gelberg LLP; and Sam Maralan, Esq., and Maralan Law, P.C.

*Counsel for the MOM Members and the MOM Managers (together, the "MOM Parties")*:

Michael Farrell, Esq., Scott Leipzig, Esq., Tim Hsu, Esq., Stephanie Roberts, Esq., Gabriela Perez, Esq., Leilee Ghassemi, Esq., Shauna Woods, Esq., Suzanne Kenney, Esq., and Allen Matkins Leck Gamble Mallory & Natsis LLP.[2]

---

[1] All capitalized terms used but not defined herein shall have the meaning ascribed thereto in the Partial Interim Award dated February 21, 2025 (the "Partial Interim Award").

[2] Allen Matkins also represented: (i) the MOM JV Entities, at all times prior to April 23, 2025, including during the Hearing and this Motion, and (ii) Makhijani and Continuum, prior to November 9, 2023.

1

*Counsel for the MOM JV Entities:*

Anthony Bisconti, Esq., and Bienert Katzman Littrell Williams, LLP.

*Counsel for Makhijani and Continuum (together, the "Makhijani Parties"):*

Marc Cohen, Esq., and Cohen Law Group, APC.

*Counsel for Nano:*

Ann Marie Mortimer, Esq., Lawrence DeMeo, Esq., Hakop Stepanyan, Esq., and Hunton Andrews Kurth LLP.

## I.    INTRODUCTION AND RELEVANT PROCEDURAL HISTORY

The Partial Interim Award:

(1) found in favor of Claimants on their direct claims for: (A) fraudulent inducement against the Makhijani Parties and the MOM Members; (B) breach of contract (Operating Agreements) against the MOM Parties; (C) breach of the implied covenant of good faith and fair dealing against the MOM Parties; (D) accounting against the MOM Parties; (E) declaratory relief against the MOM Parties; (F) forcible entry and forcible detainer against the Makhijani Parties and the MOM Parties; (G) conspiracy to commit fraudulent inducement against Nano; and (H) aiding and abetting fraudulent inducement against Nano;

(2) found against Claimants on their direct claim for breach of contract (Management Agreement) against the MOM Parties;

(3) found in favor of Claimants on their derivative claims for: (A) conversion against the Makhijani Parties, the MOM Parties, and Nano; (B) violation of Section 496 against the Makhijani Parties, the MOM Parties, and Nano; and (C) unjust enrichment against the Makhijani Parties and the MOM Parties;

(4) found against Claimants on their derivative claim for breach of contract against Nano;

(5) found against the MOM Members and the MOM JV Entities on their direct (counter) claims against Honarkar for trespass, conversion, Section 496, intentional interference with contractual relations and prospective economic advantage, declaratory and injunctive relief;

(6) found that Claimants, as the prevailing parties in this arbitration, are entitled to recover their attorney fees and costs in amounts to be determined by a post-Hearing motion; and

(7) stated the Partial Interim Award, together with the determinations regarding the amounts of attorney fees and costs to be awarded would be embodied in a Partial Final Award.

On February 28, 2025, the MOM JV Entities filed for Chapter 11 bankruptcy in the U.S. Bankruptcy Court of the District of Delaware; but on April 28, 2025, that Court ordered: "To the extent applicable, the automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified pursuant to section 362(d) of the Bankruptcy Code to allow the Honarkar Parties to: (i) pursue and obtain an award of attorneys' fees and costs in the Arbitration…." On May 5, 2025, that Court also dismissed the MOM Members' Chapter 11 bankruptcy.

Consequently, no bankruptcy stay precludes Arbitrator from issuing this ruling.

On March 5, 2025, Claimants filed their "Motion for Attorneys' Fees and Costs" (the "Motion"). On March 17, 2025, (A) the Makhijani Parties and the MOM Parties filed a joint opposition to the Motion (the "Makhijani/MOM Opposition"), and (B) Nano filed an opposition (individually the "Nano Opposition," and collectively with the Makhijani/MOM Opposition, the "Oppositions"). On May 9, 2025, Claimants filed a reply (the "Reply") to the Oppositions. On April 14, 2025, Arbitrator entertained oral argument on the Motion.

The Partial Final Award of even date and filed concurrently herewith (the "Partial Final Award"), like the Partial Interim Award: (A) found in favor of Claimants on all but one of their direct claims against Respondents as detailed above; (B) found against the MOM Members on all of their (counter) claims against Honarkar, and (C) found Claimants, as the prevailing parties in this arbitration, are entitled to recover from Respondents their attorney fees and costs. The Partial Final Award also found the MOM JV Entities' derivative claims and direct (counter) claims are currently stayed by the MOM JV Entities' bankruptcy and it therefore omitted the analysis and disposition of these claims which had been included in the Partial Interim Award.[3]

Claimants seek the following amounts in attorney's fees: $5,042,597.50 to Halpern May Ybarra Gelberg LLP ("HMYG"); $264,796 to Maralan, P.C. ("Maralan"); and $228,280.00 to Much Shelist, P.C. ("MS"). (Ybarra Decl., Ex. 1; Maralan Decl., Ex. A; Zfaty Decl., Ex. A.) They also seek a 1.5x multiplier on the fees incurred, based on their contingency fee agreement with Claimants, resulting in a total of $8,303,510.25 in attorney fees. And they seek $893,916.06 in costs and expenses. (Ybarra Decl., ¶ 16, Exs. 2-15; Zfaty Decl., Ex. A.)

ARBITRATOR, having considered the Motion, the Oppositions, and the Reply, together with the oral arguments of counsel on April 14, 2025, the entirety of the record of the Hearing, the Partial Interim Award, and all of the other pleadings and papers on file herein, hereby FINDS, CONCLUDES, RULES, and ORDERS as follows:

---

[3] Claimants do not seek attorney fees or costs on any of the stayed claims at this time.

## II.     ANALYSIS

### A.     Claimants Are Entitled To Recover Their Attorney Fees And Costs

As the prevailing parties under the Partial Interim Award, Claimants argue they are entitled to recover their attorney fees and costs under the Operating Agreements (Exs. 313-315, §§ 17, 19.10),[4] the Term Sheet (Ex. 148, at 10), the October 11, 2023 Arbitration Agreement ("Nano Arbitration Agreement") between Claimants and Nano (Ybarra Decl, Ex. 18, § 2), and California law (Civ. Code § 1717(a) ("Section 1717"); Civ. Proc. Code § 1021).[5]  They maintain there is no reasonable dispute these agreements and applicable law entitle them to recover their attorney fees and costs.  The Arbitrator agrees.

The Operating Agreements, the Term Sheet, and the Nano Arbitration Agreement all permit the Arbitrator to award attorney fees and costs to the prevailing party.  Claimants are the prevailing parties under Section 1717, which provides the "party prevailing on the contract" is the party that "recovered a greater relief in the action on the contract."  (§ 1717(a), (b)(1).)  Because the Arbitrator found Respondents breached the Operating Agreements but Claimants did not, the Claimants are the prevailing parties under the statute on the core contracts at issue.

Further, the arbitration and attorney fee provisions of the Operating Agreements, the Term Sheet, and the Nano Arbitration Agreement are broad enough to permit the Arbitrator to award attorney fees and costs to the prevailing party on the contract and non-contract claims. (*Maynard v. BTI Group, Inc.* (2013) 216 Cal. App. 4th 984, 992 ("*Maynard*") [attorney fee provision awarding fees based on the outcome of "any dispute" encompasses all claims, whether in contract, tort or otherwise, and apportionment is not required]; *Xuereb v. Marcus & Millichap, Inc.* (1992) 3 Cal. App. 4th 1338, 1341 [parties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract].)  Like the attorney fee provisions in *Maynard*, the arbitration clauses in the Operating Agreements provide that "***[a]ny dispute***, controversy or claim arising out of or relating to this Agreement (other than claims for injunctive or equitable relief), including, but not limited to, the interpretation, breach or termination thereof…shall be referred to and finally determined by arbitration…."  (Exs. 313-315, § 19.10 (emphasis added).)[6]

---

[4] Except as otherwise noted all exhibit references are to the exhibits admitted into evidence during the Hearing.

[5] While the fraud and other non-contractual claims are governed by California law, the claims for breach of the Operating Agreements are governed by Delaware law.  (Ex. 315 at § 19.1.)  Even so, the parties briefed and argued the Motion primarily as a matter of California law and Arbitrator will do the same in analyzing the Motion.

[6] Both the Term Sheet and the Nano Arbitration Agreement contain comparably broad arbitration provisions that do not differentiate between contract and tort claims.  (*See* Term Sheet, at 10 – "[a]ny dispute, controversy or claim arising out of or relating to this Term Sheet shall be referred to and finally determined by arbitration…."; Nano Arbitration Agreement, § 2 – "Claimants' claims against Nano Banc arising out of or related to the MOM Entities … shall be submitted to and finally determined by binding arbitration…".)

The similarly broad attorney fee and costs provisions in the Operating Agreements state: "Should any party hereto institute **any arbitration**, action or proceeding at law or in equity to enforce **any provision hereof**, including an action for declaratory relief or for damages by reason of an alleged breach of any provision of this Agreement, **or otherwise in connection with this Agreement, or any provision hereof,** the prevailing party shall be entitled to recover from the losing party or parties reasonable attorneys' fees and costs for services rendered to the prevailing party in such action or proceeding." (Exs. 313-315, § 17 (emphasis added).) [7] And under broad provisions like these, "the prevailing party entitled to recover fees normally will be the party whose net recovery is greater, in the sense of most accomplishing its litigation objectives…." (*Maynard*, *supra*, 216 Cal. App. 4th at p. 992.)

Claimants accomplished virtually all of their litigation objectives in this case. Claimants prevailed on all but one of their direct claims against the Respondents and also prevailed on all of the (counter) claims asserted against them by the MOM Members. As a result, if Claimants elect rescission of the Operating Agreements, the Other JV Related Agreements, and the Term Sheet, they will be entitled to restitution and consequential damages. In the alternative, if Claimants elect to affirm and retain the benefits of those agreements, they will be entitled to recover compensatory damages for fraud in the inducement and breach of the Operating Agreements. The existence of these damages is certain. Claimants are also entitled to punitive damages and declaratory relief. Respondents accomplished none of their litigation objectives.

Thus, Claimants are the prevailing parties under Section 1717 and the provisions in the parties' agreements, and are entitled to recover their attorney fees and costs from Respondents.

Respondents' arguments do not support a contrary conclusion. As noted above, there is no bankruptcy stay which precludes Arbitrator from issuing this ruling, because the Bankruptcy Court modified the stay in the MOM JV Entities' bankruptcy to allow Claimants to pursue and obtain an award of attorney fees and costs in this Arbitration, and also dismissed outright the MOM Members' Chapter 11 bankruptcy. That the MOM JV Entities' derivative claims and direct (counter) claims are stayed by the MOM JV Entities' bankruptcy is of no moment because Claimants are not seeking attorney fees and costs on those claims at this time. That those claims are intertwined with Claimants' direct claims is immaterial. The uncontroverted evidence demonstrates that the entirety of the attorney fees and costs claimed by Claimants would have been incurred if their direct claims had been their only claims in this action, because the direct and derivative claims all arose out of the same facts and circumstances. (Ybarra Decl. ¶¶ 2, 3.)

---

[7] *See also*, Term Sheet, at 10 – "The arbitrator may, in the award, allocate all or part of the costs of the arbitration, including the fees of the arbitrator, and may award attorneys' fees and costs to the prevailing party."); Nano Arbitration Agreement, § 2 - "The Arbitrator may, in the Final Award, allocate all or part of the Arbitration Costs [fees and costs charged by JAMS and/or the Arbitrator], irrespective of which party paid those Arbitration Costs. Additionally, the Arbitrator may award attorneys' fees and other costs of litigation to the prevailing party.").

Respondents' arguments that Makhijani, Continuum, and Nano are not liable for Claimants' attorney fees and costs are unavailing. It is true Makhijani and Continuum are not signatories to the Operating Agreements. But the Arbitrator long ago ruled "Continuum and its agents are plainly third-party beneficiaries of the Operating Agreements, …. Plus, it is not and cannot be disputed that Makhijani is an agent of Continuum." (Rulings on Motions Contesting Arbitrability, p. 7.) Therefore, Makhijani and Continuum are both bound by the terms of the Operating Agreements, including the attorney fee and cost provisions. Continuum is also a party to the Term Sheet, which contains an identical attorney fee and cost provision, and again Makhijani is an agent of Continuum. So, Makhijani and Continuum are both bound by the attorney fee and cost provisions of the Term Sheet. And, as noted above, Nano is liable under the Nano Arbitration Agreement for Claimants' attorney fees and costs.

Respondents also argue the Motion is premature because, "Claimants have not just failed to show a specific amount of damages incurred, they have utterly failed to show by competent evidence that _any_ damages have been incurred at all …." (Makhijani/MOM Opposition, p. 11.) Not so. Again, the Partial Interim Award (and the Partial Final Award) determined Claimants are entitled to restitution, consequential damages, compensatory damages, incidental damages, and punitive damages; the fact of these damages is certain; and some of the amounts are known. Claimant's expert Spindler calculated these damages at between $45,011,937 and $169,845,578, and he estimated the rescission value of the JV's properties at more than $200,000,000.

The Makhijani Parties and the MOM Parties argue Spindler's opinions are defective. (Makhijani/MOM Opposition, p. 12.) But they made similar arguments in opposition to the Claimants' accounting claim and the Arbitrator rejected them. Besides, it is improper for them to reargue the admissibility, weight, or sufficiency of the damages evidence in this procedural context, particularly in light of the Arbitrator's findings that they failed to create and maintain adequate books and records for the MOM JV Entities, failed to provide regular financial reporting to Claimants, failed to allow inspection of the books and records, and otherwise actively concealed the very information Claimants needed to better quantify their damages. This intentional wrongdoing by the Makhijani Parties and the MOM Parties will not be rewarded. The Arbitrator also found there is no reliable evidence establishing the fact or amount of the "infusions," which the Makhijani Parties and the MOM Parties claim as offsets.

### B.    Claimants' Lodestar Attorney Fees Are Reasonable

Section 1717 contemplates an award of "reasonable" attorney's fees and costs. HYMG, Maralan, and MS are seeking a total of $5,535,673.50 in attorney's fees, including fees incurred from March 2023 through the present. Each firm has provided declarations and comprehensive spreadsheets containing fee entries describing the work performed and the time expended, and listing the firms' hourly rates. (Ybarra Decl., Ex. 1; Maralan Decl., Ex. A; Zfaty Decl., Ex. A.)

The fee setting inquiry begins with a lodestar calculation, which involves an analysis of the reasonableness of both the hours expended and the hourly rate charged. (*PLCM Group v. Drexler* (2000) 22 Cal. 4th 1084, 1095 (*PLCM*).) In the lodestar analysis, the Arbitrator may also consider a number of factors as evidence of the value of the services rendered, including but not limited to the nature of the litigation and its difficulty, the skill displayed in presenting claims, the amount sought and the final amount recovered, the fee arrangement between counsel and his or her client, and Claimants' ultimate successes and failures. (*Ibid.*; *see also, Holguin v. DISH Network LLC* (2014) 229 Cal. App. 4th 1310, 1332 (*Holguin*); and *Mahani v. Edix Media Group, Inc.*, 935 A.2d 242, 245-46 (Del. 2007) [listing Delaware reasonableness factors].)

The Arbitrator can also adjust the lodestar calculation based on his analysis of the relevant factors. (*Serrano v. Priest (*1977) 20 Cal. 3d 25, 49 [after accepting the lodestar figure as a starting point, "the court then took into consideration various relevant factors, of which some militated in favor of augmentation and some in favor of diminution"]; *Holguin*, *supra*, 229 Cal. App. 4th at 1332, relying on *Ketchum v. Moses* (2001) 24 Cal. 4th 1122, 1132 ["Adjustment may be made upward or downward depending on the court's assessment of the fair market value for the particular action at issue."]; *Concepcion v. Amscan Holdings Inc.* (2014) 223 Cal. App. 4th 1309, 1321 ["There is no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation."].)

The Arbitrator has broad discretion to determine the reasonableness of a request for attorney fees. (*PLCM*, *supra*, 22 Cal. 4th at 1096 ["it is well established that the determination of what constitutes reasonable attorney fees is committed to the discretion of the trial court."]; *see also, Vella v. Hudgins* (1984) 151 Cal. App. 3d 515, 520 ["The amount to be awarded as attorney's fees is left to the sound discretion of the trial court. The trial judge is in the best position to evaluate the services rendered by an attorney in his courtroom…."]. Not only is the Arbitrator "the best judge of the value of professional services rendered in his court…," but he is also entitled to rely on his own personal expertise gained from 15 years as a trial judge and 10 years as an appellate court justice. (*PLCM*, *supra*, 22 Cal. 4th at 1095.)

Applying these principles, the Arbitrator finds Claimants' counsel are qualified, skilled and experienced trial lawyers in matters concerning issues similar to those in this case. They have litigated multiple related matters in the Superior Court and with JAMS since March 2023, including considerable discovery disputes. The arbitration culminated in a three-week Hearing with the Arbitrator and extensive post-hearing briefing and closing argument. Counsel achieved an unqualified win for Claimants by securing an accounting, plus the right to a return of the JV properties, restitution, consequential, compensatory, incidental, and punitive damages. Based on Arbitrator's experience, the hourly rates charged are well within reason for Southern California-based law firms in complex commercial cases. (*See PLCM*, *supra*, 22 Cal. 4th at 1095 "[t]he reasonable hourly rate is that prevailing in the community for similar work.")

7

The Arbitrator further finds the hours billed for performing specific tasks related to asserting Claimants' claims and defending against Respondents' (counter) claims in this matter were justifiable and reasonable.  This arbitration comprised a highly contentious dispute between multiple individuals and entities relating to the parties' rights and obligations in a complicated commercial real estate joint venture.  Respondents also employed litigation strategies that led to delays and additional costs in the discovery process and a significant extension of the arbitration Hearing itself.  (*See* JAMS Rule 24(g) [in determining reasonable fee award, the Arbitrator may consider failure to cooperate in discovery process that results in delay or additional costs].)

Overall, Claimants' lodestar attorney fees are prima facia reasonable and appropriate, subject to the following adjustments.

Nano argues it is not responsible for attorney fees that Claimants incurred before Nano joined this arbitration.[8]  Claimants conceded the point and calculated the percentage of HYMG's fees allocated to the pre-October 11, 2023 period.  (Ybarra Decl., ¶ 31; Maralan Decl., ¶ 6.)  The post-October 11, 2023 attorney fees for which Nano is jointly and severally liable total $4,335,269.08, comprised of (i) HYMG: $4,134,929.95; and (ii) Maralan: $200,339.13.[9]  These fees have also been redacted to remove those related to the LASC books and records action and other tasks unrelated to this arbitration.

The Arbitrator exercises his broad discretion and declines to otherwise allocate attorney fees between the claims and parties.  (*Hill v. Affirmed Housing Group* (2014) 226 Cal. App. 4th 1192, 1197.)  That Nano voluntarily agreed to join this arbitration does not mean its liability for fees should be reduced.  Nano negotiated and agreed to the attorney fee provisions of the Nano Arbitration Agreement.  Nano's argument that its "culpability is relatively minor" ignores the evidence.  The Arbitrator found Nano gave substantial assistance to, and acted in concert with, the other Respondents in fraudulently inducing Claimants to enter into the JV at the core of this dispute.  So, Nano was found liable for conspiracy to commit and aiding and abetting the commission of the fraudulent inducement by the MOM Parties and the Makhijani Parties.

The Arbitrator rejects all of Respondents' other arguments about the reasonableness of the lodestar attorney fees.  As a threshold matter, Respondents have failed to sustain their burden to challenge the specific time entries or hourly rates charged by Claimants' counsel. (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal. 4th 44, 101 ["When confronted with hundreds of pages of legal bills, trial courts are not required to identify each charge they find to be reasonable or unreasonable, necessary or unnecessary.  The party opposing the fee award can be expected to identify the particular charges it considers objectionable."].)

---

[8] Nano became a party pursuant to the Nano Arbitration Agreement on October 11, 2023.

[9] All of MS's fees were incurred before October 11, 2023 and Claimants are not seeking any of them from Nano.

As to hourly rates, Nano makes no challenge whatsoever, and the other Respondents challenge only the rates of the HYMG associates - Thomas Rubinsky and Abigail Marion.  The Arbitrator rejects this challenge and finds their hourly rates ($775 in 2023 and $850 in 2024) are reasonable in the Los Angeles market for attorneys with their experience (both practicing attorneys for more than 7 years as of 2023) and educational and professional background (graduates of Stanford and Columbia law schools; former law clerks for federal district court judges and, in Ms. Marion's case, a Second Circuit judge).

Regarding hours billed, Nano makes no specific challenge and the other Respondents challenge purported "unreasonable staffing" and "duplicative work."  They complain: "Here, between March and September 2023, twelve attorneys were staffed on this case.[]  Out of the twelve, six attorneys were partners at their respective law firms.  There is no good reason for why six partners needed to be involved, especially at the outset of this dispute and before any heavy litigation.  Nor is there any good reason for six partners, including two high profile founding partners of HMYG, to bill time on basic research and document review. …  As another example, over a week in April 2023, Mr. Ybarra spent 11.5 hours drafting a straightforward timeline and outline of claims.  *Thus, the Arbitrator should make a 50% deduction from the hours billed by the six partners*, Mr. Ybarra, Mr. May, Mr. Zfaty, Mr. Burns, Mr. Taxman, and Ms. Dogmetchi.  [¶] …  Naturally, the twelve attorneys staffed on this matter were doing duplicative work.  For example, on July 11, 2023, attorneys at all three law firms billed around twenty hours reviewing an opposition to a preliminary injunction.  On September 12, 2023, four partners across the three different law firms spent five hours preparing for and participating in a simple status conference.  *Any time spent on duplicative work must be deducted from Claimants' requested fees*."  (Makhijani/MOM Opposition, at 13-14 (italics added).)

The Arbitrator finds no unreasonable staffing, and certainly none which would support a 50% reduction in the hours billed by the partners.  The first six months of this dispute (March through September 2023) were active, with multiple TROs and other emergency relief motions.  And, unlike Allen Matkins, HMYG is a firm with fewer than 20 attorneys.  This necessarily requires partners to perform work that larger firms might push down to associates.  But partners typically perform that work in fewer hours than it would take an associate, as a result of their experience.  So, it is speculation to assume the fees incurred for these tasks would have been lower if performed by associates.  Plus, Claimants' trial team was small - two partners and two associates from HMYG, plus Mr. Maralan, attended the Hearing and performed the majority of the legal work.  By comparison, Respondents had seven attorneys attend each day of the evidentiary hearing (Messrs. Leipzig, Farrell, Hsu, Cohen, Stepanyan, and DeMeo, as well as Ms. Mortimer), with additional Allen Matkins attorneys also working on the matter.

Likewise, the Arbitrator finds Respondents have not adequately identified any particular unreasonable, duplicative or unnecessary charges to be deducted from Claimants' lodestar fees.

### C.        Claimants Are Entitled To A Multiplier

Claimants also request a multiplier of 1.5x on the $5,535,673.50 attorney fees incurred, to compensate for the contingency risk taken by Claimants and their counsel.  "California law gives the trial court vast discretion in deciding whether to employ a multiplier and at what level to set it.  No established criteria calibrate the precise size and direction of the multiplier, thus implying considerable deference to trial court decisionmaking about attorney fee awards."  (*Pollock v. Kelso* (2025) 107 Cal. App. 5th 1190, 1197-1198 (*Pollock*).)

"In determining whether to apply a multiplier to a lodestar amount, a court should consider all relevant factors, including: '(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award.'  A court may rely on these factors to increase or decrease the lodestar. Any one factor may be sufficient to apply a positive or negative multiplier."  (*Kennedy Comm'n v. City of Huntington Beach* (2023) 91 Cal. App. 5th 436, 467.)

"The primary purpose of a fee multiplier is to compensate the attorney for the prevailing party at a rate reflecting the risk of nonpayment in contingency cases."  (*Pollock*, *supra*, 107 Cal. App. 5th at 1197.)  "Here, a key factor was contingent risk.  In contingent fee cases, a fee enhancement compensates the lawyer for having taken the case despite the risk of receiving no payment in the event of a loss or the risk of a delayed payment in the event of a victory.  (Citation omitted.)  The enhancement 'is intended to approximate market-level compensation for' cases taken on contingency, 'which typically includes a premium for the risk of nonpayment or delay in payment of attorney fees.' (Citation omitted.)"  (*Sonoma Land Trust v. Thompson* (2021) 63 Cal. App. 5th 978, 986.)

Considering these factors, the Arbitrator concludes a multiplier is warranted here.  While Claimants initially retained counsel under an hourly fee arrangement, the evidence shows they were unable to keep up with the fees and costs because the MOM Parties and the Makhijani Parties cut them out of any income generated by the JV for nearly two years.  These actions were designed, at least in part, to prevent Claimants from being able to litigate this case.  As a result, Claimants were forced to secure litigation funding from a third-party funder, and their counsel was required to convert their engagement to a hybrid hourly-contingent fee agreement.  The third-party funder is now entitled to recover the amount paid by the funder, plus a substantial contingency bonus on that amount.  (Honarkar Decl. ¶ 7.)  Further, Claimants' counsel incurred (and still bears) the risk they would not be paid for much of their work in this matter, which was fiercely litigated and required substantial attorney time.  Indeed, HMYG alone is currently owed almost $2 million in outstanding attorney fees, and that amount has been due and payable since before the closing of post-Hearing briefing.  (Ybarra Decl. ¶ 9.)

For these reasons, the Arbitrator applies a multiplier of 1.5x on the $5,535,673.50 attorney fees incurred, which brings the total attorney fee award to $ 8,303,510.25.  The MOM Parties and the Makhijani Parties are jointly and severally liable for 100% of this amount.

However, the Arbitrator concludes a multiplier is not warranted against Nano.  As Nano argues, and Claimants do not dispute, unlike the MOM Parties and the Makhijani Parties, Nano did not control the JV or the income generated by the JV, did not contest arbitrability, brought no claims against Honarkar, and had no role in any discovery delays or improprieties.  There is thus no basis for applying a multiplier against Nano.

The Arbitrator rejects the other Respondents' arguments in opposition to a multiplier. While HMYG's engagement agreement is privileged (Bus. & Prof. Code § 6149), Claimants submitted evidence of the contingency component.  (Ybarra Decl. ¶ 9.)  That evidence is sufficient.  Regarding risk of non-payment, the evidence shows HMYG is owed almost $2 million in fees and costs, and most of this amount has been owed since June 2024.  (Ybarra Decl. ¶¶ 8-9.)  Absent prevailing and collecting from Respondents, HMYG would have no plausible source from which to recover these amounts.  Finally, the Partial Interim Award demonstrated the MOM Parties and the Makhijani Parties caused the financial harm that necessitated a litigation funder and contingent fee arrangement.  Their attempt to relitigate those issues here amounts to an unpersuasive if not improper sub silentio request for reconsideration.

### D.    Claimants' Costs Are Reasonable

The Operating Agreements, the Term Sheet, and the Nano Arbitration Agreement all authorize the Arbitrator to award costs to the prevailing party.  Pursuant to these agreements and Code of Civil Procedure section 1033.5 ("Section 1033.5"), Claimants seek $893,916.06 in costs relating to JAMS fees and costs, discovery vendors, courier and postal expenses, court reporter and hearing transcript fees, deposition reporter and videographer fees, trial and deposition exhibit expenses, trial tech expenses, service of process fees, printing expenses, filing fees, and after-hours HVAC costs, as well as expert fees for two of Claimants' experts and expert fees charged by two of Respondents' experts for deposition.  (Ex. 315, § 19.10; Ybarra Decl., Ex. 18, § 2.)

Ultimately, Section 1033.5 provides discretion in determining what is a reasonable cost award, as do JAMS Rules 24(f) and (g).  While Section 1033.5 does not contemplate expert fees, where sophisticated parties have contracted for the recovery of costs, a prevailing party is entitled to costs beyond those specified in section 1033.5, including expert fees.  (*Arnst Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal. App. 4th 464, 491-492 [sophisticated parties may choose a broader standard authorizing recovery of reasonable litigation costs]; *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal. App. 4th 1050, 1056-66 [expert witness fees recoverable based on contractual provision].)

11

Having reviewed the supporting declarations, and exercising discretion, the Arbitrator finds the $893,916.06 in costs requested by Claimants are reasonable.  The Arbitrator rejects Nano's argument that Section 1033.5(b)(1) precludes the recovery of expert fees as costs.

## III.    SUMMARY AND CONCLUSION

The Motion is granted and Claimants are awarded $8,303,510.25 in attorney fees ($5,535,673.50 x 1.5), plus $893,916.06 in costs, for a total of $9,197,426.31.  The MOM Parties and the Makhijani Parties are jointly and severally liable for the entire $9,197,426.31 total.  But of the $9,197,426.31 total, Nano is jointly and severally liable for only $5,229,185.14, which is comprised of $4,335,269.08 in (post-October 11, 2023) attorney fees, plus $893,916.06 in costs. This ruling resolves all attorney fee and cost claims presented by the Motion.  All arguments not expressly discussed are either unnecessary to this ruling or have been considered and rejected.

DATED:  May 23, 2025

_____

Hon. David A. Thompson (Ret.)